Dorothy M. MOORE, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

93–134 L.

United States Court of Federal Claims

July 2, 1998.

William J. Travis and Stephen Robert Clark, Greensfelder, Hemker & Gale, P.C., St. Louis, Missouri, for plaintiff.

Lisa A. Holden, U.S. Department of Justice, Environmental & Natural Resources Division, General Litigation Section, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

Pending is plaintiffs' motion to certify this case as a class action. Plaintiffs own property traversed by the Katy Trail, a recreational trail located between Machens and Sedalia, Missouri. They assert there are over 2000 potential class members who likewise own property along the Katy Trail. They claim compensation under the Fifth Amendment for property taken by the United States when it prevented the reversion of their fee interests to lands underlying railroads by interposing a recreational trail used by the general public. The motion was briefed on two occasions, argued before the court, and supplemented with additional filings after oral argument; it is now ready for decision. For the reasons stated below, the motion to certify is granted.

## BACKGROUND

Since the 1920s this country's railroad track has dwindled, recently at a rate of 3000 miles of track per year. *See Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 5–7, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). To slow the loss of track and preserve railroad rights-of-way for future use, Congress passed legislation promoting the conversion of abandoned rail-lines to trails. *See id.* This endeavor culminated in the National Trails System Act Amendments of 1983 ("Amendments"), Pub.L. 98–11, 97 Stat. 48, to the National Trails System Act, codified, as amended, 16 U.S.C.A. § 1241, *et seq.* (West 1985 & Supp.1998), authorizing the Interstate Commerce Commission ("ICC")[1] to preserve existing railroad rights-of-way not currently in service for future use and allowing interim use of the existing rights-of-way as recreational trails. *See id.* Section 8(d) of the Amendments, codified at 16 U.S.C. § 1247(d), provides railroads with an alternative to abandoning outright a particular route, namely, negotiating an interim trail use agreement with a government or private entity prepared to assume financial and managerial responsibility for the right-of-way. *See id.* Both the railroad and the public benefit from such an arrangement; the railroad preserves the right to reclaim the route in the indefinite future, while the public can use the rights-of-way in the meantime for recreational purposes.

To facilitate the conversion of railroad routes to trails, Congress preempted state property law governing the railroad rights-of-way: "in the case of interim use of any established railroad rights-of-way ... such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment

---

1. The ICC was replaced by the Surface Transportation Board in 1995. To avoid confusion, this opinion will use the term ICC.

of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). Preemption of state law was necessary because, as Congress recognized, the existing rights-of-way might otherwise be extinguished under state law when abandoned by the railroad:

> The key finding of this amendment is that interim use of a railroad right-of-way for trial use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use.

H.R.Rep. No. 28, 98th Cong., 1st Sess. 8–9 (1983), *reprinted in* 1983 U.S.C.C.A.N. 112.

By interfering with state property rights, the Amendments created the potential that private property would be taken for public use. *See Preseault,* 494 U.S. at 16, 110 S.Ct. 914. Whether a taking occurs in any particular case depends upon the interest retained by the property owner whose land is subject to the right-of-way. *See National Wildlife Fed'n v. ICC,* 850 F.2d 694, 703–704 (D.C.Cir. 1988). The nature of the retained property interests are, in turn, a function of state law and the language of the conveyance to the railroad. *See id.* According to plaintiffs, their reversionary interests in the railroad rights-of-way were taken by operation of the Amendments, entitling them to compensation under the Fifth Amendment of the U.S. Constitution and the Tucker Act, 28 U.S.C. § 1491 (1994).

## DISCUSSION

The sole issue before the court is the procedural question of whether to certify this case as a class action. For the reasons stated below, the court concludes that certification is appropriate. In making this determination, the court does not resolve any substantive legal issue raised by the parties.

■ Although Rule 23 of the Rules of the United States Court of Federal Claims permits the court to "determine in each case whether a class action may be maintained and under what terms and conditions," class actions are generally disfavored in this court. The leading decision on class certification continues to be *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972). There, the court declined to establish an "over-all formula" for deciding which cases would benefit by proceeding as a class suit, but resolved to proceed on "a case-by-case basis." *See id.* at 140, 453 F.2d 1272. The court did, however, apply eight criteria in deciding to certify the class in that case. *See id.* at 140–141, 453 F.2d 1272. These criteria, which have been cited in later opinions, are: (1) whether the potential litigants constitute a large but manageable class; (2) a common question of law is present; (3) that common issue predominates over any separate factual issues affecting individual members; (4) the claims of the present plaintiffs must be typical of the claims of the class; (5) the government must have acted on grounds generally applicable to the whole class; (6) the claims of the class must be so small that it is doubtful they would be otherwise pursued; (7) the current plaintiffs will adequately protect the interests of the class; and (8) there is a risk of inconsistent adjudications if individual actions were maintained separately, some in district court and some in this court. *See id.* More generally, class actions are appropriate only where they serve the interests of justice. *See Kominers v. United States* 3 Cl.Ct. 684, 686 (1983). As discussed below, this case is well-suited for class action treatment under *Quinault* as well as for reasons of equity.

### 1. Is the class large but manageable?

■ The court considers 2000–plus class members to be a large but manageable group. *Cf. Hannon v. United States,* 31 Fed.Cl. 98, 100 (1994) (class of 340 DEA employees held to be large and manageable). The court notes that the potential class consists of readily identifiable private landowners located in a defined geographic area, which creates a situation amenable to providing notice. *See Quinault,* 197 Ct.Cl. at 141, 453 F.2d 1272 ("This is not a widely scattered class. Most of the [class members] live on or

near the Reservation...."). Plaintiffs have assured the court that they could notify potential class members using a variety of methods. The ready identification of class members distinguishes this case from other decisions denying class certification, such as *Armitage v. United States*, 18 Cl.Ct. 310 (1989) (declining to certify geographically dispersed class identified by reference to ten criteria). Defendant does not dispute that the class is sufficiently large and that notice is not problematic, but contends that the class would nonetheless be unmanageable because there may be significant factual differences among the proposed class members. That concern will be addressed below in connection with the third *Quinault* factor.

### 2. Is there a common question of law?

■ The potential class members present a common legal question. Plaintiffs and the putative class members own land burdened by railroad rights-of-way that were converted to public use as the Katy Trail. In *Preseault*, a similar case brought by property owners in Vermont, the Supreme Court noted that the "primary issue in this case is whether Congress has violated the Fifth Amendment by precluding reversion of state property interests." *Preseault*, 494 U.S. at 9, 110 S.Ct. 914. Although this case differs in its details from *Preseault*—for instance, Missouri not Vermont law defines the property interests at stake—the basic legal issue remains the same: whether the Amendments prevented the extinction of the railroad rights-of-way, and thereby the reversion to the fee owner of exclusive possession of the burdened parcel of land, causing a taking under the Fifth Amendment. Moreover, the government will likely present common defenses to all such claims (for example, that the railroad received a fee interest, that the railroad did not abandon the rights-of-way, and/or that current use of the rights-of-way as an interim trail does not exceed the scope of the conveyance to the railroad).

### 3. Does the common legal question predominate over separate factual inquiry?

■ The government argues that even though the putative class shares "a common-

ality [because of] the general statutory scheme," the claims of each property holder "must be examined on a fact-by-fact basis" and that these issues overshadow the common legal question. Specifically, defendant suggests that determining the precise interest of each putative class member will be necessary. It is true that takings are ordinarily fact-intensive inquiries requiring the court to consider whether there is an actual property interest and whether, under the particular circumstances, the government took that interest within the meaning of the Fifth Amendment. *See Hage v. United States*, 35 Fed.Cl. 147, 151 (1996). In this case, the property interests at stake are defined by separate, original grants to the railroad, whether voluntary or involuntary, which must be examined to ascertain the nature and scope of the property interest conveyed. Plaintiffs contend, however, citing *Brown v. Weare*, 348 Mo. 135, 152 S.W.2d 649 (1941), *Jordan v. Stallings*, 911 S.W.2d 653 (Mo.App.1995), and other cases, that regardless of how the rights-of-way were conveyed, whether by condemnation action, by easement deed, by general warranty deed, or by prescriptive easement, under Missouri law the railroad received easements over the land and not the fee.

To gain a more concrete understanding of the range of conveyances to the railroad, the court asked the plaintiffs to furnish a representative sampling of the conveyances at issue. Those furnished indicate that the number of variants is limited. Of the thirty-one instruments provided, nearly half convey a "strip of land ... for the purpose of a right of way for a railroad and for no other purpose;" five convey a "strip, belt, or piece of land ... to be used as a right of way on which to build said company's railroad;" three convey a "strip, belt, or piece of land ... for a right of way for said company." Most of the remaining conveyances use such formulations as "to use said lands as a right of way on which to construct their main line," or "so long as the same shall be used for Railroad purposes." The court's initial review of Missouri law suggests that plaintiffs are correct that there is at least a presumption that grants of these types convey only an easement for a right of way, and not, as

defendant suggests, a fee. *See e.g., Schuermann Enters., Inc. v. St. Louis County,* 436 S.W.2d 666 (1969); *Brown,* 348 Mo. 135, 152 S.W.2d 649; *Jordan,* 911 S.W.2d 653. Without deciding the question, at this point it appears that there is little likelihood that the precise formulation used in the transfer will spawn any significant amount of piecemeal review.[2]

Defendant further observes that the sample of conveyances includes only those that were recorded, raising the question of what happens if the conveyance establishing the right-of-way was never recorded. Plaintiffs persuasively argue that the railroad would only have taken a right-of-way by prescriptive easement, and not fee simple by adverse possession. Although no relevant Missouri case was cited by the parties (and the court could locate none), *Pollnow v. Wisconsin Dep't of Nat'l Resources,* 88 Wis.2d 350, 276 N.W.2d 738 (1979), cited by plaintiff, reviews the case law and commentary and concludes that the majority rule is that "a railroad company acquires by prescription or adverse possession only an easement in a right-of-way." *See id.,* 276 N.W.2d at 741.

In sum, the court concludes that Missouri law appears to minimize most factual differences between the conveyances, creating essentially the same interest in the railroad. Based on the sample of deeds furnished, the court expects the exception to be rare. Although the precise nature of these property interests will be explored later, the court notes that it will examine the four corners of the conveyance, a straightforward task, and apply Missouri law, to decide the matter.[3] The only other arguably relevant evidence would be the intent of the parties, which, given that the parties are long dead, will probably not generate additional evidence. The absence of the need for extensive factual proofs thus sets this case apart from other cases in which class certification was denied.

*See, e.g., Crone v. United States,* 210 Ct.Cl. 499, 538 F.2d 875 (1976) (validity of death determinations with respect to each class member need to be resolved through trial on an individual basis); *Hannon,* 31 Fed.Cl. 98 (necessary to establish actual duties performed by each class member); *Black v. United States,* 24 Cl.Ct. 471 (1991) (necessary to inquire into degree and type of disability of each class member, as well as diagnoses of different physicians); *Saunooke v. United States,* 8 Cl.Ct. 327 (1985) (need to make individualized determinations of applicable tax exemptions, and, in effect, "reaudit" each class member); *O'Hanlon v. United States,* 7 Cl.Ct. 204 (1985) (need to prove presence or absence of coercion with respect to each class member).

Similarly, the computation of damages, although necessarily individualized, should be relatively formulaic. *See Hannon,* 31 Fed.Cl. at 103 ("Moreover, if liability is found, and the quantification of ... damages remains the sole issue which requires a separate determination in each case, class certification should not be ruled out."). Accordingly, for the present, the common legal question of the effect of the Amendments appears to outweigh the factual differences.

*4. Are the claims of the named plaintiffs typical of the class?*

■ Turning to the fourth *Quinault* factor, the court concludes that plaintiffs' claims are typical of the claims of the class. Each plaintiff and potential class member owns in fee simple the land traversed by the Katy Trail. And each plaintiff and potential class member is suing under the Tucker Act and Fifth Amendment for a taking accomplished by operation of the Amendments. Accordingly, the typicality requirement has been met. *Cf. Hannon,* 31 Fed.Cl. at 103–104.

**2.** Only a few of the instruments differ in significant respects from the others. Some convey more than one strip of land, for example "for operation of ... side track" or "for station ground." Another instrument was titled a "Warranty Deed" for a 100–foot strip "including road bed of the ... Railway as located within said strip, the boundary lines of said strip to be fifty (50) feet ..." Among the sample instruments

there was also a judgment recorded from a condemnation action.

**3.** The court is considering the possibility of appointing a special master to review the deeds and make recommendations to the court regarding the nature of the property interests conveyed under Missouri law.

5. *Has the government acted on grounds applicable to the whole class?*

■ This factor has been met for the same reasons that the typicality requirement was satisfied. The Amendments impact all class members. The government did not act separately as to the landowners; rather its actions affected them simultaneously.

6. *Were the damages allegedly suffered by the individual class members too slight to be worth litigating separately?*

■ The government notes that several of the plaintiffs and presumably some of the class members own significant acreage and therefore would suffer considerable damage if the court determines that there was a taking. Plaintiffs, on the other hand, assert that litigation costs could easily exceed the amount of the owner's damages. At issue are peculiarly shaped tracts of land. All will be narrow and no doubt many will be short—the length of a building lot. While it is impossible at this point to estimate the amounts of the various claims, the court is persuaded that most claims are small enough that it is doubtful they would be pursued otherwise. This determination is supported by the fact that only a handful of the landowners along the Katy Trail have filed individual actions for compensation.

7. *Will the named plaintiffs adequately protect the interests of the class?*

The government does not argue the named plaintiffs have a conflict of interest that would prevent them from representing interests of the class, and the court perceives none. *Cf. Hannon,* 31 Fed.Cl. at 104 (concluding that *Quinault* protection requirement is satisfied where similarly situated persons are suing under identical statutes). The plaintiffs and their attorneys will adequately represent the interests of the class.

8. *Is there a risk of inconsistent adjudications if individual actions are separately maintained?*

The court agrees with plaintiffs that the eighth *Quinault* criterion no longer applies because the Federal Circuit now hears appeals from both the district courts and this

court in cases seeking compensation for a taking. *See* 28 U.S.C. § 1295 (1994).

*The equitable test: Does certifying this case as a class action serve the interests of justice?*

■ According to an affidavit submitted by plaintiffs, several hundred affected landowners formed a group that opposed the plan to create the Katy Trail on the existing rights-of-way. A number of these landowners were among the original plaintiffs in *Glosemeyer v. Missouri–Kansas–Texas Railroad Co.,* 685 F.Supp. 1108 (E.D.Mo.1988), aff'd 879 F.2d 316 (8th Cir.1989) ("*Glosemeyer I*"). That case was eventually dismissed with prejudice on the grounds that plaintiffs' proper remedy was a suit against the United States under the Tucker Act. *Id.,* 879 F.2d at 324. Subsequently, a number of the *Glosemeyer I* plaintiffs agreed that such a suit was the appropriate next step. The interested landowners were advised that the Mountain States Legal Foundation would file a class-action on their behalf. Although an action was filed in this court, *Glosemeyer v. United States,* No. 93–126 L, the Mountain States Legal Foundation informed the interested landowners that it would not be able to file the suit as a class action only a few days before the statute of limitations expired. To preserve their rights in light of this development, the named plaintiffs of the putative class filed this action on the day in which the statute of limitations would have run. If plaintiffs' motion to certify the class were denied, the potential class would be forever barred from seeking redress. Although this is not sufficient in itself to permit a class action, it weighs in plaintiffs' favor, especially because there are no counter-balancing equitable factors. *Cf. Armitage v. United States,* 18 Cl.Ct. 310, 315 (1989) (stating that the statute of limitations "is a legitimate concern" in deciding whether to certify a class).

CONCLUSION

For the reasons stated, plaintiffs' motion to certify this action as a class action on an "opt-in" basis is granted. The class shall consist of landowners whose property is burdened by the Katy Trail. Counsel for plain-

tiffs and defendant will attempt to agree upon the exact form of the notice to be used to inform potential class members that this action is pending (including the Notice of Appearance to be attached) and the procedure for distribution.[4] If agreement is reached, the forms should be submitted to the court by August 3, 1998, for approval before service upon class members. If no agreement is reached, the parties shall file their respective views with the court by August 3, 1998.

The government may contest the eligibility of any individual to join the class on the grounds that (1) the individual is not the fee owner of the burdened land, (2) the interest conveyed to the railroad contains no limitation and was in fee simple absolute, (3) the supporting documentation attached to the Notice of Appearance is inadequate, or (4) any other similar reason. Any such challenge must be made within 60 days of the filing date of the Notice of Appearance or it is waived.

---

4. The court does note certain minimum elements of the Notice of Appearance. Any person wishing to join the class must file a Notice of Appearance not later than a date certain after notice is served. The Notice of Appearance shall have attached to it documentation that establishes (1) ownership of the parcel of land in question, (2) an affidavit that the parcel of land is presently burdened by the Katy Trail, and (3) proof of the property interest conveyed to the railroad. The court waives the filing fees for class members who file a Notice of Appearance.